Cite as 2023 Ark. App. 457

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CR-22-674

| | | |
|---|---|---|
| | | **Opinion Delivered** October 18, 2023 |
| COREE MCGAUGH | | |
| | APPELLANT | APPEAL FROM THE YELL COUNTY CIRCUIT COURT, NORTHERN DISTRICT [NO. 75NCR-20-30] |
| V. | | |
| | | HONORABLE JERRY RAMEY, JUDGE |
| STATE OF ARKANSAS | | |
| | APPELLEE | AFFIRMED |

## STEPHANIE POTTER BARRETT, Judge

Coree McGaugh was convicted by a Yell County Circuit Court jury of one count of rape and sentenced to thirty years in the Arkansas Department of Correction. On appeal, McGaugh argues that the circuit court erred (1) in denying his directed-verdict motion; and (2) in not declaring a mistrial when the jury informed the court that it was split 11–1, and the remaining juror was not willing to change his or her mind. We affirm.

McGaugh's victim was his eight-year-old daughter, MC1, who, after a lesson on personal safety at her elementary school in April 2019, reported to her counselor that her father had been abusing her sexually for the past several months. The counselor reported the allegations to the Child Abuse Hotline, and Brittney Reed, an investigator with the Arkansas State Police Crimes Against Children Division, interviewed MC1, who disclosed the sexual-abuse allegations to Reed. MC1 was taken to The Hamilton House, a Child

Advocacy Center in Fort Smith, for a medical examination as well as a forensic interview. Jennifer Canavan conducted a forensic interview with MC1 at The Hamilton House, and MC1 underwent a sexual assault nursing examination (SANE) with Malea McCormick.

McCormick testified at trial about her findings from MC1's examination. She stated that there was an area of whiteness on the hymen, which could indicate sexual abuse; but she also said that the majority of exams of children seen for sexual-assault exams with disclosures of sexual abuse do not have definitive findings because that part of the body heals from injury quickly. Although MC1 did not have any injuries to her anal area, McCormick stated that a lack of injury did not rule out sexual penetration. McCormick collected oral, vaginal, and rectal swabs from MC1; her underwear; and a blood-stain card for DNA purposes.

Jennifer Beaty-West, the DNA supervisor for the Arkansas State Crime Laboratory, testified that she received seven items in this case—vaginal swabs, oral swabs, rectal swabs, a cutting from the inner crotch of underwear, and a blood sample, all from MC1; a known oral sample from McGaugh; and a tape lift of MC1's underwear. Beaty-West explained that in cases involving a female victim and an alleged male perpetrator, there is a secondary testing method called Y-STRs, which specifically looks at male DNA, but that the testing was only able to narrow down the DNA to a paternal line. She testified that male DNA was found on the vaginal, oral, and anal swabs but not enough to obtain a Y-STR profile to make a comparison to a known sample. However, the inner-crotch sample of MC1's underwear contained sperm cells, and the tape lift of MC1's underwear indicated the presence of DNA

2

from two males: one was too limited to make a comparison, but the second was identified as consistent with McGaugh's Y-STR profile, meaning that neither McGaugh nor his paternally related male relatives could be excluded as a contributor of that Y-STR profile.[1] Beaty-West stated that while she could never say conclusively how DNA evidence arrived on an item, a more direct, aggressive contact with a direct transfer of bodily fluids would more likely leave DNA behind.

MC1 testified that she had been living with her father in April 2019; at that time, she was eight years old and in the second grade. She said that she went to see her school counselor after the personal-safety lesson and told her that her father had been raping her for three to four months. MC1 testified that her father had been through a breakup with a girlfriend, and he first "fingered" her after she returned from weekend visitation at her mother's house. She said that a day or two after that incident, they had intercourse in her bedroom; her father made her take her clothes off, he took his clothes off, and then he put his penis into her vagina while she was lying on the bed and he was standing in front of her. She said that her father would bribe her with food, toys, video games, or allowing her to go to her friends' houses if she would have sex with him. MC1 said that those encounters occurred often, but she did not tell anyone about them until April 2019 because she did not have the confidence to say anything until that time. She testified that she had intercourse

---

[1]Beaty-West testified that Ronald McGaugh gave an oral sample at a later time that was compared to the Y-STR profiles obtained from the underwear, and he was excluded as a contributor.

with her father the night before she told the counselor what was happening, and she had not bathed or changed her underwear before going to school the next day. MC1 denied that she was making up the allegations against her father.

On cross-examination, MC1 admitted that prior to April 2019, she saw her mother only on the weekends; it bothered her because she had a hard time telling her mother goodbye; she wished she could see her mother more often; her mother wanted MC1 to come live with her; and MC1 had told her mother that she wanted to move in with her. MC1 also admitted that life was tough with her father because she had to clean the house and help take care of her younger twin siblings; that she did not like having to do chores at her father's house and had more fun at her mom's house; and that she had told her father she wanted to live with her mom.

After the State rested, McGaugh moved for a directed verdict on the basis that McGaugh was never identified by MC1 as the person who had raped her. The State countered that McGaugh had been identified as MC1's father by several witnesses, and MC1 had referred to her father as the person who had raped her. Although the circuit court stated that it had no doubt there was enough testimony set forth that McGaugh was the person referenced in the allegations, it allowed the State to reopen its case, and MC1 identified McGaugh in the courtroom and as the person who had raped her. After that identification, McGaugh moved for directed verdict again, arguing that McGaugh was not timely identified as the person who had raped MC1. The circuit court denied the motion, finding that there had been sufficient evidence presented during the trial that McGaugh was the person against

4

whom the allegations had been made; furthermore, allowing the State to reopen its case and have MC1 identify McGaugh as the person who had raped her addressed that issue.

McGaugh then moved for a direct verdict on the basis that the State had failed to prove its case, arguing, "And that the State has failed to prove beyond a reasonable doubt that Coree McGaugh committed rape by engaging in sexual intercourse or deviant sexual activity with another person, namely [MC1], who is less than 14 years of age." This motion was denied by the circuit court.

Carla McGaugh, McGaugh's mother, testified that she and MC1 had a close mother-daughter type of relationship, but she had not spoken to her since the night before MC1 accused her father of raping her. Carla said that MC1 was responsible for helping to pick up after herself, and although MC1 was not interested in taking responsibility for things like her homework or helping to pick up around the house, it was not a big deal. Carla noticed that MC1's attitude was always worse after she came home from visiting her mother; that MC1 had been untruthful on many occasions; and she believed MC1 did not want to live with McGaugh anymore. On cross-examination, Carla said that McGaugh told her that he had relinquished his parental rights to all three of his children after he was incarcerated; she opined that McGaugh was devastated by MC1's allegations, had hit rock bottom, and had given up.

The defense also called Fusha Brown, McGaugh's sister, who testified that McGaugh is a wonderful father. She said that MC1 had gotten used to being number one, and there were some jealousy issues when her twin siblings were born and MC1 was asked to help with

5

more chores around the house. Brown also asserted that MC1 is not a truthful child and that she believed MC1 wanted to go live with her mother.

McGaugh waived his right to testify at trial, and the defense rested after Brown's testimony. McGaugh renewed his directed-verdict motions, which were again denied by the circuit court. Jury instructions were read, and both the State and the defense gave closing arguments.

The jury retired to deliberate. During that time, the jurors sent several written questions to the judge, who responded that they had to refer to the testimony, evidence, and instructions provided in relation to the questions. The next note from the jurors stated that they were split 6–6 and could not come to an agreement; the circuit court instructed the jury to continue deliberations. The jurors sent another note stating, "Eight four," and the judge, with agreement from both the State and the defense, gave the jury the "dynamite instruction," which stated that it was in the best interest of both the State and the defense for this jury to arrive at an agreement, if at all possible, because a hung jury meant a continuance of the case and a delay of justice. The instruction further provided that, under the oath taken as jurors, they were obligated to render verdicts in accordance with the law and evidence; that every effort should be made to harmonize their views on the merits of the case, giving due consideration to the views and opinions of all the jurors; but that no juror should surrender his or her sincere beliefs in order to reach a verdict. The circuit court then returned the jurors to the jury room for further deliberation.

Later that night, the jurors sent a note that they were still "stuck" at 8–4, and the foreman told the circuit court that further deliberation that night would not be fruitful. When asked if some movement could be made if they adjourned for the night and resumed the next morning, the foreman said that she could not say there would not be if they had time to think about their decision. The circuit court went on record in chambers with both the prosecutor and defense counsel, stating that unless there was a strenuous objection, it would send the jurors home for the night and resume deliberations the next morning. Defense counsel asked at what point would there be a hung jury; the court stated that the jury foreman said maybe there could be some movement, and it was willing to give the jury an opportunity to reach a verdict.

The next morning, the jurors requested a copy of the court reporter's notes as well as a copy of MC1's deposition; the circuit court responded that the jury had to refer to the testimony, evidence, and instructions provided. Defense counsel then asked at what point would a decision be made that there was a hung jury; the circuit court stated that it could not answer that question, and they would just have to see how it "rode out," stating that if the jurors said that they could not reach an agreement no matter how many times they were sent back, that would be when a hung jury would be considered. Defense counsel agreed with this statement.

An hour and a half after starting deliberations on the second day, the jury sent a note asking what would happen if the vote was 11–1, and the one juror was 100 percent confident in his or her decision. The circuit court noted that the jurors had been deliberating for only

one and a half hours that day, and it did not want to stop now because the jurors were clearly

making some headway. The prosecutor and defense counsel agreed that the circuit court

could send a note stating, "Please continue to deliberate." The circuit court then told both

the prosecutor and defense counsel:

> And then we've also discussed a time frame. I know we can't go forever on this situation. So, we are going to come in when I give the Bailiff the note, I am going to set a timer for one hour. And in one hour we will knock on the door and we will bring the jury in and ask them if they are going to be able to make any progress, if they say, no, I believe at that point both sides have agreed to move toward a mistrial—and we will get it reset with a third panel. If they say that they are making progress, then we will let them make progress.

Both the prosecutor and defense counsel agreed to this procedure.

The jury then reached a verdict of guilty. When the circuit court asked if either side

wanted to poll the jury, the State declined, but defense counsel asked that the jury be polled.

Each juror stated that his or her decision was that McGaugh was guilty.

In the sentencing phase, the State read MC1's victim-impact statement to the jury,

and then both sides proceeded with closing arguments to the jury. After the jury retired to

deliberate, defense counsel moved for a mistrial on the basis of the State's representation to

the jury that McGaugh was a twice-convicted felon during the time frame when he was raping

MC1, but one of the felonies had occurred after the allegations of rape. The prosecutor

offered to accept responsibility for the mistake; the circuit court brought the jury back in and

allowed the State to reopen its closing argument and correct the mistake. The jury then

sentenced McGaugh to thirty years' imprisonment.

McGaugh argues that the circuit court erred in denying his motion for directed verdict for two reasons—first, because the State failed to identify McGaugh before resting and, second, because the State failed to prove the elements of rape beyond a reasonable doubt.

A motion for directed verdict at a jury trial is considered a challenge to the sufficiency of the evidence. *Marbley v. State*, 2019 Ark. App. 583, 590 S.W.3d 793. In reviewing a challenge to the sufficiency of the evidence, this court views the evidence in the light most favorable to the State and considers only the evidence that supports the verdict. *Barfield v. State*, 2019 Ark. App. 501, 588 S.W.3d 412. We will affirm the circuit court's denial of the directed-verdict motion if there is substantial evidence, either direct or circumstantial, to support the verdict. *Marbley*, *supra*. Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation and conjecture. *Barfield*, *supra*.

To preserve a challenge to the sufficiency of the evidence, a defendant must move for a directed verdict at the close of the State's case and at the close of all the evidence; specific grounds for the motion must be stated. Ark. R. Crim. P. 33.1 (2022); *Mead v. State*, 2023 Ark. App. 384. Rule 33.1 is to be strictly construed, and failure to adhere to the rule constitutes a waiver as to any question pertaining to the sufficiency of the evidence to support the verdict. *Id.* A general motion for directed verdict asserting that the State has failed to prove its case is inadequate to preserve a sufficiency challenge for appeal. *Akram v. State*, 2018 Ark. App. 504, 560 S.W.3d 509.

9

"A person commits rape if he or she engages in sexual intercourse or deviate sexual activity with another person who is less than fourteen years of age." Ark. Code Ann. § 5-14-103(a)(3)(A) (Supp. 2021). Deviate sexual activity means "any act of sexual gratification involving [t]he penetration, however, slight, of the anus or mouth of a person by the penis of another person; or [t]he penetration, however, slight, of the labia majora or anus of a person by any body member or foreign instrument manipulated by another person." Ark. Code. Ann. § 5-14-101(1)(A) and (B) (Supp. 2021).

We disagree with McGaugh's argument that the circuit court erred in denying his directed-verdict motion on the basis that he was not timely identified as the perpetrator by MC1. Evidence was presented at trial that McGaugh is MC1's father, and MC1 testified that her father is the person who raped her. Even if that identification evidence was in some manner construed to be insufficient, the circuit court, in an abundance of caution, allowed the State to reopen its case to specifically supply the proof of the identity of McGaugh as MC1's father and the perpetrator of her rape. The rationale behind Rule 33.1 is that when specific deficiencies in proof are identified, the circuit court can grant the motion or allow the State to reopen its case and supply the missing proof. *Maxwell v. State*, 373 Ark. 553, 285 S.W.3d 195 (2008). That is exactly what happened in this case, and the State supplied the more exact proof of identification that defense counsel claimed was missing. We affirm on this point.

McGaugh also contends that the circuit court erred in denying his directed-verdict motion because the State failed to prove the elements of rape beyond a reasonable doubt.

10

This argument is not preserved for appellate review because McGaugh did not specifically pinpoint what proof was missing from the State's case; rather, he just parroted the statutory elements of rape in his directed-verdict motion, not specifying which elements the State had failed to prove. Such a general motion is insufficient to preserve a sufficiency argument for appeal. *Akram, supra.*[2]

McGaugh also argues that the circuit court erred in not declaring a mistrial when the jury sent the court a note that it was split 11–1, and the one person was not willing to change his or her vote. A mistrial is an extreme and drastic remedy that will be resorted to only when there has been an error so prejudicial that justice cannot be served by continuing with the trial or when the fundamental fairness of the trial has been manifestly affected. *McEuen v. State*, 2023 Ark. App. 65, 660 S.W.3d 615. A circuit court has wide discretion in granting or denying a mistrial, and absent an abuse of that discretion, the circuit court's decision will not be disturbed on appeal. *Id.*

---

[2]Even if this argument had been preserved, we would still affirm the rape conviction. McGaugh admitted in his brief that MC1 testified that she was less than fourteen years of age and that he had sexual intercourse with her, and he concedes that the State had established a prima facie case for rape; nevertheless, he argues that MC1's testimony could not be relied on due to her inconsistent statements, her motive to fabricate the allegations, and the absence of physical injury. This court does not weigh the evidence presented at trial, nor does it assess witness credibility. *Turner v. State*, 2018 Ark. App. 5, 538 S.W.3d 227. It is the function of the jury as the finder of fact to resolve questions of inconsistent evidence and conflicting testimony; the jury may believe the State's version of the facts over the defendant's account. *McLemore v. State*, 2022 Ark. App. 512, 657 S.W.3d 190. A rape victim's uncorroborated testimony describing penetration may constitute substantial evidence to sustain a rape conviction, even when the victim is a child. *Hartley v. State*, 2022 Ark. 197, 654 S.W.3d 802.

11

We hold that McGaugh's argument is not preserved for appeal because he never moved for a mistrial on the basis that the jury was deadlocked.[3] Defense counsel asked during the first night of jury deliberations and again on the morning of the second day of jury deliberations at what point a hung jury would be considered, but at no time before the jury rendered its verdict did defense counsel move for a mistrial. In fact, when the jury sent the note on the morning of the second day of deliberations after deliberating only one and a half hours that the vote was 11–1 and the one juror was not willing to change his or her mind, both the prosecutor and defense counsel agreed to the circuit court's sending a note back asking the jury to continue to deliberate. The jury then came back with a unanimous guilty verdict, which was confirmed by the polling of the jurors. The only motion for mistrial came after the jury had found McGaugh guilty and was deliberating his sentence. That motion for mistrial was based on the prosecutor's erroneous statement to the jury that McGaugh was a two-time felon at the time the rape occurred when, in fact, he was not.[4]

Affirmed.

---

[3]McGaugh's first trial on this matter ended in a hung jury, and a mistrial was granted.

[4]We would still affirm if we reached the merits. The decision whether to declare a mistrial due to a jury's inability to reach a verdict is discretionary with the circuit court, and it is not reversed absent an abuse of that discretion. *Davis v. State*, 319 Ark. 460, 892 S.W.2d 472 (1995). "Determining when the jury cannot agree is a matter over which the trial court has considerable discretion." *McGirt v. State*, 289 Ark. 7, 13, 708 S.W.2d 620, 623 (1986). Here, the circuit court gave the "dynamite" instruction, which it is allowed to do. *Davis*, *supra*. It is within the circuit court's discretion to determine if the jury could not agree. *McGirt*, *supra*. In the present case, each time the jury returned to deliberate, movement was made toward a unanimous verdict, which was eventually reached after two partial days of deliberation; each juror was polled at the defense's request and affirmed his or her vote of guilty.

THYER and WOOD, JJ., agree.

*James Law Firm*, by: *William O. "Bill" James, Jr.*, and *Drew Curtis*, for appellant.

*Tim Griffin*, Att'y Gen., by: *A. Evangeline Bacon*, Ass't Att'y Gen., for appellee.